Filed 7/11/13  In re Aryanna W. CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ARYANNA W., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D063521 |
| Plaintiff and Respondent, | (Super. Ct. No. J518191) |
| v. | |
| ANGELICA W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Angelica W. appeals a juvenile court order terminating her parental rights to her minor daughter, Aryanna W., under Welfare and Institutions Code section 366.26.[1] Angelica challenges the sufficiency of the evidence to support the court's finding the beneficial parent-child relationship exception to adoption did not apply to preclude terminating her parental rights. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2011, the court declared three-year-old Aryanna a dependent under section 300, subdivision (b) and removed her from Angelica's custody based on findings Angelica had a mental illness that rendered her unable to provide adequate care for Aryanna. Earlier that month, Angelica had called the child welfare hotline to say she could no longer care for Aryanna and had considered killing herself. She said she regularly self-medicated with marijuana and alcohol and had a history of depression and suicidal thoughts for which she had previously been hospitalized. The court placed Aryanna in out-of-home care and ordered Angelica to participate in reunification services, including counseling, therapy, parenting education, substance abuse testing and treatment and supervised visits with Aryanna.

During the next six months, Angelica did not avail herself of services. She was terminated from therapy because she had been absent for six consecutive weeks, and completed only two parenting classes. Angelica consistently failed to show up for visits, which caused Aryanna to be disappointed and angry, and exacerbated Aryanna's symptoms of depression. Consequently, the San Diego County Health and Human Services Agency (Agency) filed a petition for modification under section 388 to have the court terminate

---

[1] All further statutory references are to the Welfare and Institutions Code.

Angelica's services before the 12-month date. The court found the Agency made a prima facie showing and ordered a hearing on the petition.

Angelica's visits with Aryanna continued to be inconsistent. During one visit she did attend, Angelica became outraged about the way Aryanna's caregiver had cut her hair. Angelica began yelling and threatened to report the caregiver for child abuse. This upset Aryanna, who began to scream and cry. Aryanna told the social worker she did not want to see Angelica and wanted to go home to her caregiver. Angelica refused to apologize. In the social worker's opinion, Angelica did not understand how her actions affected Aryanna, who was emotionally fragile, and Angelica was not able to provide Aryanna with the emotional support she needed to form a secure bond.

Angelica was on step 2 of her 12-step program. She had not attended her support group at the Veterans Administration hospital in more than a month, and still did not have a sponsor. She attended seven therapy sessions and missed three.

At the combined six-month review and section 388 hearing, the court granted Agency's modification petition. The court found there was a substantial likelihood reunification would not occur because Angelica had not regularly visited Aryanna, participated in services or made substantive progress with her case plan. The court terminated services and set a section 366.26 selection and implementation hearing.

According to an assessment report, Aryanna had a diagnosis of adjustment disorder and had emotional issues related to her separation from her mother. Angelica was now visiting Aryanna once a week. Aryanna was excited to see Angelica, and talked about her on the way to visits. She also talked about her dad, her caregiver and her therapist. During most of the

visits, Angelica was energetic and positive, but on three occasions, she was depressed and watched Aryanna with a blank stare. Angelica either ignored Aryanna or declined her invitation to play, which left Aryanna feeling unloved and confused. Aryanna had difficulty leaving visits, but would cheer up when she arrived at the caregiver's home. Angelica began missing service appointments again, failed to attend a bonding study and became difficult to contact by telephone.

Aryanna said she had two moms: Angelica and her caregiver. Aryanna's therapist reported that Aryanna proudly told other children in the waiting room that the caregiver is her mom. Aryanna was generally adoptable and the caregiver wanted to adopt her.

In January 2013, Angelica filed a section 388 petition seeking to have the court place Aryanna with her and vacate the selection and implementation hearing. The petition alleged Angelica's circumstances had changed and it was in Aryanna's best interests to grant the petition. The court ordered an evidentiary hearing on the petition, to be combined with the selection and implementation hearing.

In an addendum report, the social worker noted Angelica had not attended her group therapy meetings for three months and had not attended any Alcoholics Anonymous meetings for four months. She did attend therapy for a few months before quitting. The therapist believed that although Angelica had made some progress, she needed continued therapy to meet her treatment goals. She refused to consider taking prescription medications. Angelica was recently arrested for a domestic dispute with her husband, who obtained a restraining order against her.

4

At the combined hearing, Angelica's therapist testified Angelica had attended 13 therapy sessions but stopped treatment before reaching her goals. The therapist could not evaluate Angelica's progress because she had not seen her for six months.

Robert Kelin, Ph.D., testified he conducted a 60- to 90-minute bonding study involving Angelica and Aryanna and concluded they had a moderate bond. In Dr. Kelin's opinion, there was "potential" for harm to Aryanna if that bond were severed, but he could not predict what the effect would be, and he had no opinion as to what would be best for Aryanna's long-term care.

Social worker Jessica Ahlberg testified the quality of Angelica's visits had improved, but her circumstances had not otherwise changed because she had not completed the requirements of her case plan. Angelica had not ameliorated the risks that caused Aryanna to become a dependent. Ahlberg recommended adoption as Aryanna's permanent plan. Although there was a relationship between Angelica and Aryanna, it did not outweigh the benefits Aryanna would gain from being adopted.

Angelica testified she knew what the Agency expected of her with respect to her case plan, but she did not start participating in services until January 2012. She had a diagnosis of clinical depression but stopped taking her prescription medication. Angelica attended nine of 28 drug treatment sessions. She attended 13 of 24 therapy sessions, stopped going, and started again in February 2013.

After considering the evidence and arguments of counsel, the court denied the section 388 petition, finding Angelica had not met her burden of showing changed circumstances or that it would be in Aryanna's best interests to be returned to Angelica's custody. The court

5

further found Aryanna was likely to be adopted and none of the exceptions to adoption applied. The court terminated parental rights and referred Aryanna for adoptive placement.

## DISCUSSION

Angelica challenges the sufficiency of the evidence to support the court's finding the beneficial parent-child relationship exception to adoption did not apply to preclude terminating her parental rights. She asserts she regularly and consistently visited Aryanna. Angelica further asserts she had an emotionally significant and positive relationship with Aryanna and the benefits of continuing the relationship were not outweighed by the benefits of adoption.

### A

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M*. (2006) 138 Cal.App.4th 529, 534.) At the selection and implementation hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid*.)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 573.) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the child under one of the specified statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re Erik P*. (2002) 104 Cal.App.4th 395, 401.)

6

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the adoption preference if termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." We have interpreted the phrase " 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment from child to parent. (*Ibid.*; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.)

We review an order terminating parental rights for substantial evidence. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. We do not consider the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence.

7

Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) The parent has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B

Here, Angelica's visits with Aryanna were initially inconsistent, but eventually became consistent. Nevertheless, Angelica did not meet her burden of showing there was a beneficial parent-child relationship sufficient to apply the exception of section 366.26, subdivision (c)(1)(B)(i).

Angelica did not avail herself of services in order to ameliorate the risks that caused Aryanna to become a dependent child. She knew what was necessary in order to reunify with Aryanna, but was unwilling or unable to put Aryanna's needs before her own. Indeed, shortly before the selection and implementation hearing, Angelica was arrested for a domestic dispute and became the subject of a restraining order. In this regard, Angelica did not act in a parental role.

Although Aryanna was generally excited to see Angelica at visits, she was occasionally frightened by Angelica's demeanor, inappropriate statements and angry outbursts. At times, Angelica ignored Aryanna or failed to engage her, which exacerbated Aryanna's emotional problems. Angelica did not understand how her actions negatively affected Aryanna and did not provide her with emotional support. Despite having difficulty separating from Angelica

8

after visits, Aryanna fully recovered once she returned home to her caregiver.  There was no evidence Aryanna asked for Angelica between visits or was otherwise adversely affected by Angelica's absence from her daily life.  "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)  The love and affection Angelica shared with Aryanna during visits was not enough to show Aryanna had a " 'significant, positive, emotional attachment' " to Angelica such that terminating the parent-child relationship would result in great harm to Aryanna.[2]  (*In re Jason J.*, *supra*, 175 Cal.App.4th at pp. 936-938; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Further, Angelica did not show that maintaining the parent-child relationship outweighed the benefits of adoption for Aryanna.  In the social worker's opinion, Aryanna's need for stability, safety and permanency outweighed any possible detriment that would be caused by severing the parental relationship.  The court was required to, and did, weigh the strength and quality of the parent-child relationship, and the detriment involved in terminating it, against the potential benefit of an adoptive home for Aryanna.  We do not reweigh the evidence or substitute our judgment for that of the juvenile court.  (*In re Casey D.*, *supra*, 70 Cal.App.4th at pp. 52-53.)

Contrary to Angelica's position, a permanent plan other than adoption would not serve Aryanna's best interests because adoption is the only option that would provide her with the stability and permanence she so desperately needs.  (*In re Beatrice M.* (1994) 29 Cal.App.4th

---

[2]     Even Dr. Kelin, after conducting a bonding study, could not give an opinion about whether Aryanna would be harmed if the parent-child relationship were severed.

9

1411, 1419 [Legislature has decreed guardianship is not in best interests of children who cannot be returned to their parents; only adoption affords the most permanent and secure alternative]; *In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368-1369 [parents' preference to preserve family unit does not override best interests of minors in stability and security of adoptive home].)  Substantial evidence supports the court's finding the beneficial parent-child relationship exception did not apply to preclude terminating parental rights.

DISPOSITION

The order is affirmed.

HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.


McDONALD, J.

10